[No. 3501.   Dec. 13, 1930.]

[On Rehearing July 7, 1931.]

BOARD OF TRUSTEES OF TOWN OF LAS VEGAS v. GERDEMAN.

[300 Pac. 937.]

D. J. Leahy, of Las Vegas, for appellant.

Charles W. G. Ward, M. E. Noble, and A. T. Rogers, Jr., all of Las Vegas, for appellee.

## OPINION OF THE COURT

WATSON, J.

On May 31, 1916, the board of trustees of the town of Las Vegas, administering the Las Vegas Land Grant, hereinafter called the board, entered into a contract with R. C. Storrie & Company. As to its provisions we have little information, but its general purpose was to develop and colonize the lands of the grant, utilizing permits to appropriate public waters which had been previously granted to the board. Under this contract considerable work was done, including the construction of dam and headgate, intake canal, and reservoir. The enterprise is commonly known as the Storrie project.

Las Vegas Land & Water Company, hereinafter called the company, became the successor of R. C. Storrie & Company under this contract, and in August, 1922, the board conveyed to the company all of the lands, water rights, and other property included in the project. As a result of these dealings ,the company was indebted to the board in a sum exceeding $250,000. On the same day, as representing such indebtedness, it issued to the board some forty bonds, each secured by a mortgage on a specifically described parcel of land, with an appurtenant water right from the reservoir. It also executed another mortgage for the general security of these bonds, specifically covering the dam and headgate, the reservoir, the intake canal and its right of way, and all waters and water rights appertaining to the project, but no lands. It also gave another mortgage on that day to secure various debts of the company amounting to $11,250. Of this mortgage, Louis C. Ilfeld is present trustee. So far as this case is concerned, his rights are on the same basis as those of the board.

In 1924, to secure a bond issue of upwards of $150,000, the company issued a trust mortgage in which A. H. Gerdeman is now, and will be referred to hereinafter as, trustee. This mortgage specifically described some 9,000 acres of lands within the project which were not included in any of the mortgages above mentioned, with water rights for such of it as is irrigable from the reservoir. As to these lands and water rights, it purports on its face to be a first lien. It also covers all of the other property of the company, as to which it purports to be a second lien.

Prior to this litigation the company became insolvent. This suit was for the foreclosure of the several mortgages above referred to as given to the board, and named a large number of defendants as making some claim thereto, including the trustee. The trustee answered and by cross-complaint sought a foreclosure of his mortgage. Foreclosures were decreed and sales had, and the present appeal involves certain provisions of the decree and subsequent proceedings.

The most important question in the case grows out of the conclusion that the water rights, which the trustee claimed were appurtenant to some 3,196 acres of the lands mortgaged to him, "are included within and subject to the mortgage of the plaintiff * * * and included within and subject to the mortgage of the cross complainant, Louis C. Ilfeld Trustee," and the provision that such lands be sold with the "appurtenances thereunto belonging or in any wise appertaining, excepting water or water rights mortgaged to the plaintiff and cross complainant, L. C. Ilfeld, Trustee."

The effect of this conclusion and of this provision is not in controversy. The question is whether the purchaser under the trustee's mortgage should enjoy the right to a supply of water from the reservoir for the irrigation of these lands on the mere payment of the usual annual or seasonal rates and charges. The trustee admits that his mortgage and the rights of the purchaser will be subject to such charges, but that otherwise the right is fully vested. On the other hand, the board contends that the trustee's

mortgage carries no water right and that the purchaser will acquire none.

While several points of law are discussed, we find no material difference between counsel except as to the construction of the mortgages. The settlement of this difference will be decisive.

The trustee's mortgage, after specifically describing the lands, continues

"together with * * * the * * * appurtenances thereunto belonging or in any wise appertaining, including all water and water rights which are now or which may hereafter become appurtenant thereto. * * *"

It also contains this covenant:

"The mortgagor covenants that there is now appurtenant, and shall be kept appurtenant, to the land herein mortgaged, irrigable from the irrigation system hereinafter mentioned, the right to receive and use thereon a pro rata portion of all water developed or stored in or by the reservoir and other water works (heretofore constructed pursuant to the contract of May 31, 1916, between said Board of Trustees of the Town of Las Vegas and R. C. Storrie & Company, predecessors in interest of the mortgagor herein), commonly known as the Sanguijuela Irrigation System, which water includes all water adjudicated to said R. C. Storrie and Company by the decree of the District Court of San Miguel County on the 6th day of December, 1921; which right will entitle each acre of said land irrigable from said Sanguijuela Irrigation System as now constructed to receive one and one-half acre feet of water, measured at the point of delivery of said land, during each irrigating season in which there is available for delivery from said system 18,000 acre feet or more, and a pro rata quantity in seasons of scarcity of water. It is understood that the continuance of such appurtenant water right may be or become dependent upon the applying of such water to beneficial use upon the said premises, and also upon the payment of assessments or rates for the delivery of such water, and the mortgagor, for itself, its grantees, successors and assigns, covenants and agrees to perform all such conditions to the continued existence and enjoyment of said water right, and further agrees that if there shall hereafter occur any continuous period of eighteen months during which said appurtenant water, or any part thereof, is not applied to beneficial use upon said premises, or if any of the aforesaid assessments or rates for the supplying of said water shall become delinquent, then the mortgagee, at its option, may foreclose this mortgage, and may also (with or without foreclosure) take possession of said premises, and apply, or cause to be applied, to beneficial use thereon, the water so appurtenant to said premises, or any part thereof, and, likewise, at its option, pay any such delinquent assessments or rates for the applying of such water."

. . It is plain, therefore, that in so far as the company had the power, it mortgaged to the trustee the water right in question. Whether it had the power will depend upon the terms of its earlier mortgage.

. . The board's general mortgage expressly includes the water right granted by the state to the board

"to appropriate waters * *·* and to irrigate the lands under said project ; together with all permits and licenses for the diversion or appropriation of said waters; * * * also all water and water rights, ditches and ditch rights acquired or owned by the party of the first part, or to which it may be entitled, in connection with the said irrigation project above mentioned,"

and continues :

"It being the intention of this Indenture to include herein, and to describe and mortgage hereby, all of the real property with its appurtenances described in said contract of May 31, 1916, and therein contracted to be conveyed to the said predecessors in interest of the mortgagor herein, except the several parcels of land specifically described in said contract and therein referred to as irrigable and non-irrigable lands (said irrigable and non-irrigable lands comprising approximately 15,607.4 acres,) the remainder of the lands specifically described in said contract being contained in the reservoir site hereinbefore described and mortgaged; which said excepted lands ·are more particularly described in the deed ·of even date herewith conveying· the same from said Grant Board to the mortgagor herein."

It is not to be doubted, therefore, that unless modified by subsequent provisions of the mortgage, the water right here in question was already under a lien when the trustee's mortgage was made.

The provisions which the trustee contends have this modifying effect are as follows:

"It is expressly understood and agreed by the parties hereto that, unless in default hereunder, the mortgagor, its successors or assigns, may supply water from the said Sanguijuela Irrigation System to other lands than those described in said contract of May 31, 1916, and may utilize said water for power purposes, and other beneficial uses, as well as irrigation, and may sell, lease and otherwise dispose of water and water rights for irrigation and said other beneficial uses, to persons, corporations and municipalities, upon such terms and conditions as the mortgagor, its successors or assigns, may agree upon with such parties, without let or hindrance upon the part of the mortgagee; provided, that no sale, or contract to sell, water or water rights shall be made by the mortgagor, its successors or assigns, which would or might impair or affect the existence or the enjoyment of the water right, or any water right, appurtenant to any of the re-

spective parcels of land described in and mortgaged by the aforesaid mortgages, securing the bonds, which are also secured hereby, or covenanted (in or by the terms of the said mortgages hereinbefore referred to as securing the said bonds which are also secured by this mortgage) to be made and kept appurtenant to any of said parcels of land; and such water rights may be sold either with parcels of the land described in said contract of May 31, 1916, or separately to owners of other lands, at such prices and upon such terms as may be agreed upon with such purchasers without let or hindrance by the mortgagee; provided, that the water rights, or contract for water rights, so sold shall not require the delivery during any irrigation season of water from said system, as now constructed exceeding an aggregate of 6000 acre feet for purposes other than irrigation, nor exceeding an aggregate of 18,000 acre feet for all purposes, including irrigation; and provided further, that each water right so sold, or contracted to be sold, for irrigation, shall entitle the holder of such right to receive one and one-half acre feet for each acre of his land irrigable from said system as now constructed, (measured at the point of delivery upon his land) during every irrigation season in which there is available for delivery from said reservoir an aggregate of 18,000 acre feet or more; and provided, further, that all water rights so sold, or contracted to be sold, shall be of the same rank, and shall impose the same degree of obligation in respect to delivery of water, so that no water right sold from said system shall have preference over any other, and in times of scarcity of water the supply shall be prorated among all the water rights outstanding; but the mortgagor herein, its successors or assigns, shall have the right to make such rules, regulations and by-laws, not inconsistent with the covenants and conditions of this mortgage, as to the distribution of water, the management of said property, and the collection of deferred payments, and assessments and charges upon water rights as shall be found necessary, and also to make such assessments and charges on all said water rights, pro-rata, as shall provide properly for the operation, maintenance and repair of said irrigation system, and to make such assessments, charges and deferred payments liens upon, and they shall be deemed and held as liens upon, the water and water rights so sold, and any land to which such water or water rights may become appurtenant.

"It is further understood and agreed that the execution and delivery of the conveyance by the mortgagee to the mortgagor of the real property, water and water-rights referred to in said contract of May 31, 1916, shall not release or discharge the covenant of said contract to the effect that the mortgagor herein shall not sell or contract to sell lands other than those on which the mortgagee herein holds the bonds secured hereunder of a greater aggregate value than one hundred and ten per cent of the aggregate value of the lands sold by the mortgagor upon which the mortgagee holds such bonds, unless and until all of said lands upon which the mortgagee holds such bonds shall have been sold by the mortgagor; (it being agreed, for the purposes of this covenant, that the value of each acre of irrigable land of the mortgagor is $100.00, and of each acre of non-irrigable land is $15.00); and the mortgagor herein, its successors and assigns, shall observe and perform said covenant; provided, however,

that the title or right of any purchaser of any of the aforesaid land shall not be impaired or affected by the fact that the sale of such land by the mortgagor, its successors or assigns, may have been made in violation of this covenant. * * *

"It is hereby declared that it is the understanding and intention of the parties hereto that the foreclosure of this mortgage will not affect the right of any purchaser of water or water rights, sold as hereinbefore provided, to receive water from said Sanguijuela Irrigation System, provided such water has been applied to beneficial use in conformity with the laws of the State of New Mexico."

The trial court found as a fact that

"3196 acres of said above described tracts of lands are irrigable under the irrigation system of Las Vegas Water Users Association, commonly known as the Sanguijuela Irrigation System, or Storrie Project; that water, for the purpose of irrigation, from said irrigation system has been for some years last past and is now applied to the irrigation of said 3196 acres of land, and is now appurtenant thereto."

It does not directly appear, but is to be inferred from the record and from the admissions and arguments of counsel, that the company, prior to its insolvency, had contracted with divers persons for the sale of these 3,196 acres with water rights; that they were all in default in their contracts; and that their rights were foreclosed in this litigation under the cross complaint of the trustee.

These facts ,the trustee contends, meet the requirement of the board's mortgage for immunity from the effects of any foreclosure. On the other hand, the board contends that the trustee is merely a mortgagee and not a "purchaser" who, by the terms of the board's mortgage, is entitled to such immunity. It admits that a subsisting contract for the sale of any of this land would come within the terms of the immunity as soon as water had been applied for irrigation. But, it argues, that a contract of sale which is forfeited is no sale at all, and that the result of forfeiture is to sever the appurtenant water right and to restore it to the lien of the board's mortgage.

Considering the latter proposition first, it is to be noted that the board's mortgage retains no control over these contracts of sale and no voice in declaring them forfeit. The provision is that the company may sell on any terms and conditions and without let or hindrance. The board could not have declared a forfeiture. These purchase

contracts could not have been foreclosed at its suit. It is the trustee who had and exercised that right.

If the trustee were out of the picture and we had the simple situation of a contract of sale declared forfeit, and the purchaser ousted, it might be well enough to say that the original situation respecting the land and the water right was restored, and the board's lien reinstated over the latter. That would be a matter of small importance. The company would have the right immediately to resell the land with the water right. No one would lose but the defaulting vendee. But the trustee's mortgage complicates the situation. To sever the water right from the land destroys his security.

Let us see, then, whether he who has become the grantee in the special masters deed is not to be deemed a "purchaser", entitled to immunity from the effects of foreclosure of the board's mortgage. It will not be contended that the vendee in one of these contracts of sale could not transmit his interest by deed, will, or descent, or that it could not be mortgaged or subjected to the claims of creditors. It will hardly be contended that the company and one of these vendees could not, by joining, have passed complete legal title to the land and the water right. It would seem that the word "purchaser" must be enlarged to include his privies in estate. It seems to us that privity exists between the vendee and the company on the one hand, and the special master's grantee on the other. so that the latter is a "purchaser" within the fair construction of the board's mortgage. The connecting link between them is the trustee's mortgage. It cannot be doubted that the company had the right to mortgage the lands it owned, with any water rights which might thereafter become appurtenant. It is admitted that the contract of sale, with the application of water to beneficial use, made the water right appurtenant to the land. The vendee bought subject to the trustee's mortgage and, as a matter of privity, is in the same legal situation as if, after entering into the contract of purchase and applying the water to beneficial use, he and the company had joined in giving a mortgage to the trustee.

.The board argues that; under this view, the company, by a mere fictitious contract of sale or a fictitious mortgage, might obtain the release of water rights sufficient for all lands not mortgaged to the board. It is sufficient answer to say that no such case is here presented. How we should deal with a situation of that kind need not be considered now.

The board also points out that the permission to sell or contract to sell or to "sell, lease or otherwise dispose of" the water rights extends only to disposing of them "for beneficial uses," and argues that to mortgage them to raise money is not to dispose of them for beneficial use. But, as above shown, we do not consider the mortgage to have been the permitted sale, nor to have worked immunity from foreclosure of the board's lien. The sale was to the vendee in the executory contract, and, necessarily, to his privies. That sale was for beneficial use. The vendee's land and appurtenant water right, and the vendor's interest likewise, pass, by way of the trustee's mortgage, to the special master's grantee. It could not pass by way of the board's mortgage, because it was in effect released from that lien; it was immune from its foreclosure; the board did not seek to foreclose these vendees' interests; it had no power even to declare them forfeited.

This reasoning leads to the conclusion that the court erred in ruling that the water rights in question were included within the board's mortgage and should not pass as appurtenant to the lands sold under the trustee's mortgage.

The board contends that the trustee was not in a position to raise this question because of certain admissions in its answers and cross-complaint as to the juniority of its mortgage. While the language may be somewhat ambiguous, we do not think it should be construed as any admission of the board's present contention.

Appellant, the trustee, also objects that the deed given him as purchaser at the special master's sale, and confirmed, is made subject "to the lien of receiver's certificates heretofore issued against the above described lands by Clarence Iden, the receiver of Las Vegas Land &

Water Company." Appellee, the board, admits that this was erroneous.

The judgment must be reversed. The cause will be remanded, with a direction to the district court to modify its decree and the proceedings thereunder to conform to the views herein expressed, and to proceed otherwise as may be necessary in view of such modifications. It is so ordered.

BICKLEY, C. J., and SIMMS, J., concur.

PARKER and CATRON, JJ., did not participate.

### ON REHEARING

WATSON, J.

The scope of the rehearing granted was limited. Counsel were asked to reargue only the matter of including in the master's deed to appellant the reservation subjecting the property to the lien of certain receiver's certificates.

A stipulation since filed enables us now to dispose of the cause. Counsel agree that the obligation of such receiver's certificates should be apportioned among the purchasers at the foreclosure sale; that the sum of $11,037.68 is apportionable to appellant, as a purchaser, together with interest thereon at the rate of 6 per cent. per annum from February 21, 1929; that said sum, both principal and interest, is due and owing from appellant to the holder and owner of such certificates, out of any property or proceeds in his hands or to come into his hands or possession as trustee; and that it constitutes a first lien on the land, real estate, water rights, and property purchased at the foreclosure sale by appellant, A. H. Gerdeman, trustee.

Except as thus modified, the original opinion and disposition of the cause will stand. In remanding the cause, there will be attached to our mandate a certified copy of the stipulation herein referred to, and the same will thereupon constitute a part of the record proper in this cause in the district court. It is so ordered.

BICKLEY, C. J., and SADLER, J., concur.

PARKER and HUDSPETH, JJ., did not participate.